# 10 CV 4062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

FAIVELEY TRANSPORT USA, INC.,  :
FAIVELEY TRANSPORT NORDIC AB,  :
FAIVELEY TRANSPORT AMIENS S.A.S. :
and ELLCON NATIONAL, INC.  :

     Plaintiffs,  :

     v.  :

WABTEC CORPORATION,  :

     Defendant.  :

------------------------------------------------------------x

**ECF CASE**

Civil Case No. _____

**COMPLAINT**

**Jury Trial Demanded**

RECEIVED
MAY 14 2010
U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiffs Faiveley Transport USA, Inc., Faiveley Transport Nordic AB, Faiveley Transport Amiens S.A.S., and Ellcon National, Inc. (together, the "Faiveley Plaintiffs"), by and through their attorneys, Mayer Brown LLP, for their complaint against defendant Wabtec Corporation ("Wabtec" or "Defendant"), allege as follows:

## NATURE OF THE PROCEEDING
## AND RELIEF SOUGHT

     1.    This is an action seeking monetary relief for misappropriation of trade secrets, unfair competition, interference with prospective contractual relations, interference with economic advantage, and unjust enrichment relating to Wabtec's misuse of the Faiveley Plaintiffs' valuable confidential information in connection with families of products (including complete units, components and associated spare parts) related to the Brake Friction Cylinder ("BFC"), the PB actuator ("PB"), and the PBA actuator ("PBA") (collectively, the "Products"). Wabtec's has competed with the Faiveley Plaintiffs through unlawful and improper means, and the Faiveley Plaintiffs' business has been damaged by Wabtec's actions.

## PARTIES

2.    Plaintiff Faiveley Transport USA, Inc. ("Faiveley USA") is incorporated and organized under the laws of New York, with its principal place of business at 50 Beechtree Boulevard, Greenville, South Carolina.   Faiveley USA is the parent company of Ellcon National, Inc.

3.    Plaintiff Faiveley Transport Nordic AB ("Faiveley Nordic") is a Swedish corporation with its principal place of business at Andra Tvärgatan 41, Landskrona, Sweden. Faiveley Nordic produces, sells, and services a wide range of products for freight and passenger railway systems, including brake systems, couplers, air conditioning, and door systems.

4.    Plaintiff Faiveley Transport Amiens ("Faiveley Amiens") is a French corporation with its principal place of business at Espace Industriel Nord 115, rue André Durouchez, 80046 Amiens Cedex 2. Faiveley Amiens produces, sells and services a wide range of products for freight and passenger railway systems, including brake systems, couplers, and truck-mounted brake equipment.

5.    Ellcon National, Inc. ("Ellcon") is organized and incorporated under the laws of New York, with its principal place of business at 50 Beechtree Boulevard, Greenville, South Carolina.   Faiveley USA acquired Ellcon in August 2008.   Ellcon produces, sells and services a wide range of products for freight and passenger railway systems, including brake systems, couplers, air conditioning, door systems, and windows.

6.    Wabtec is a corporation organized under the laws of Delaware, with its principal place of business at 1001 Air Brake Avenue, Wilmerding, Pennsylvania 15148. Wabtec manufactures products for locomotives, freight cars, and passenger transit vehicles.

2

## JURISDICTION AND VENUE

7.     Subject matter jurisdiction for this action arises under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiffs and the defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This Court has personal jurisdiction over Wabtec because Wabtec has transacted business in the State of New York in connection with matters giving rise to this suit.  This Court also has personal jurisdiction over Wabtec because it has committed torts outside the State of New York causing injury to Plaintiff in New York, and regularly does or solicits business in New York, and/or derives substantial revenue from goods and services rendered in New York, and/or expects or reasonably should expect its tortious actions to have consequences in New York.

8.     Venue in this District is proper under 28 U.S.C. § 1391(a) because (i) a substantial part of the events giving rise to the claim occurred in this District, including, among other things, Wabtec's use of the trade secrets misappropriated from the Faiveley Plaintiffs to negotiate with New York City Transit Authority ("NYCT") to secure the contract for the Pick Up, Overhaul and Return of R142A TBUs, and (ii) the harm caused by Wabtec's actions has been suffered here.

## FACTUAL ALLEGATIONS

I.     **BUSINESS OF SAB WABCO AND THE FAIVELEY PLAINTIFFS**

   A.     **SAB Wabco**

9.     The former SAB Wabco Group AB ("SAB Wabco") was a pre-eminent designer, manufacturer, supplier, and service provider for brake equipment, couplers, and wheel sets for railway cars.

3

10.    The core business of SAB Wabco was the design, manufacture, sale and servicing of brake equipment, couplers and wheel sets for railway cars.  This included a broad range of products, such as pneumatic/electro-pneumatic brake control systems; air generation and treatment units; brake actuators; brake riggings and calipers; tread brake units; brake discs and hydraulic brake systems.

B.    **The Faiveley Plaintiffs**

11.    Faiveley Transport, S.A., Faiveley Transport Malmö AB., Faiveley USA, Faiveley Nordic, Faiveley Amiens, and Ellcon (collectively, "Faiveley") are in the business of designing, manufacturing, and selling innovative subcomponent systems for railway vehicles

12.    In November 2004, Faiveley Transport SA ("Faiveley Transport") acquired SAB Wabco.

13.    The acquisition of SAB Wabco significantly expanded Faiveley's product line (which had previously concentrated on railway car doors, air conditioning units, electronics and pantographs) to incorporate SAB Wabco's product line for brake systems and couplers (including the Products), and transformed Faiveley into one of the world's leading suppliers of railway car subcomponent solutions.

14.    Faiveley Transport Malmö AB ("Faiveley Malmö") is the successor-in-interest to SAB Wabco's intellectual property rights in the Products.

15.    Faiveley Malmö has conveyed the technology and associated know-how related to the BFC to Faiveley Nordic, such that Faiveley Nordic possesses the trade secrets associated with the BFC.  Faiveley Nordic engineers, manufactures, sells and services the BFC

4

family of products.  Until the fall of 2008, Faiveley Nordic sold the BFC to Faiveley USA, which in turn served as the service provider and distributor for the BFC in the North American market.  Since then, Ellcon has taken over the distribution and service of the BFC in North America.

16.     Faiveley Malmö has conveyed the technology and associated know-how related to the PB and PBA to Faiveley Amiens, such that Faiveley Amiens possesses the trade secrets associated with the PB and PBA.  Faiveley Amiens engineers, manufactures, sells, and services the PB and PBA.  Until the fall of 2008, Faiveley Amiens sold the PB and PBA to Faiveley USA, which in turn served as the service provider and distributor of the PB and PBA in the North American market.  Since then, Ellcon has taken over the distribution and service of the PB and PBA in North America.  Faiveley Amiens has conveyed the technology related to the PB to Ellcon, such that Ellcon possesses the trade secrets to the PB necessary to manufacture, market, sell and service the PB.  Ellcon produces the PB from its facility in Greenville, South Carolina.

C.     **Quality Assurance Associated with SAB Wabco**

17.     SAB Wabco was formed in 1913 and was the global originator of the brake regulation system.  SAB Wabco's customers included some of the largest passenger rail transit authorities in countries around the world (including, *inter alia*, France, Australia, Sweden, Hong Kong, etc.), as well as virtually all of the major railcar builders in the world (including, *inter alia*, Alstom, Bombardier and Siemens).

18.     With the acquisition of SAB Wabco, Faiveley acquired all of the goodwill and positive market and product reputation that SAB Wabco had developed over the course of

5

many years as a top-quality designer, manufacturer and seller of railway car brake and coupler equipment.

19.     Faiveley has become a leading supplier of railway car equipment to major transit authorities and car builders worldwide.

## II.     SAB WABCO'S INVENTION OF THE BFC TBU

### A.     Development of the BFC TBU

20.     A Tread Brake Unit ("TBU") is a brake component installed in the truck frame of a railway car.  A TBU generates force to push or pull a brake shoe onto the surface of a wheel tread to slow or stop the railway car.

21.     There are numerous design possibilities for a TBU mounted in a truck frame, but each requires an actuator (usually a pneumatic activated actuator) to generate the required braking force.  The use of a Brake Friction Cylinder ("BFC") actuator as a TBU application resulted in the novel BFC TBU design and application.

22.     A BFC actuator is a type of pneumatic actuator which can be used either in a traditional TBU application with lever arrangements, or by itself (without the need for additional levers) to generate the required force to push or pull the brake shoe to the wheel tread of a railway car.  The output force of the BFC actuator unit is controlled by a variety of factors, including the applied air pressure, the angle of the internal wedge design, the arrangement and positioning of the internal components (such as springs), and the efficiency of the moving parts inside the BFC actuator.

23.     The friction resulting from the contact between the brake shoe and the wheel treads wears down the brake shoe surface over time and eventually increases the size of the clearance between the wheel and the brake shoe in the release position.  The size of the clearance can significantly impact the overall deceleration rate of the vehicle and, consequently, the railway car's stopping distance.  Therefore, the size of the clearance must be readjusted when the brake shoe wears down to ensure that the deceleration rate is kept fairly constant throughout the life of the brake shoe, and consequently meets the safety requirements for the stopping distance.  This can be accomplished in two ways:  Either the clearance can be manually readjusted during regular maintenance, or the brake can be equipped with a "slack adjuster" which automatically adjusts the unit to the optimum distance between the wheel tread and the brake shoe.

24.     The BFC actuator and, accordingly, the BFC TBU have an integrated slack adjuster which automatically readjusts the internal components to keep the clearance between the wheel tread and the brake shoe within the required range.

25.     The BFC, and its use as a BFC TBU, was developed by the predecessor-in-interest to SAB Wabco in the early 1970s.  The principal design objectives for the BFC and the BFC TBU were to develop a product that was smaller, lighter in weight, more compact, more robust against operational loads, and more flexible in terms of output force than the existing designs and technology in the marketplace.  To achieve these objectives, SAB Wabco developed a design where the level of output force could be adjusted internally by exchanging only a few components in the BFC, as opposed to pre-existing technology that required significant modification to the design of the entire brake assembly and settings to achieve a different level of output force.

26.    One of the major technological innovations of the BFC and the BFC TBU was the amplification and variation of the output force by means of applying SAB Wabco's novel "wedge technology." The wedge technology involves changing the wedge angle of the piston and certain parts associated with the piston, in order to increase or decrease the generated force. The development of the BFC and the associated wedge technology significantly reduced the amount of space needed for a typical TBU installation and provided flexibility in the output force range, thereby greatly expanding the number of potential applications for this type of product and providing significant cost and production benefits.

27.    Another significant innovation of the BFC actuator and the BFC TBU was the integration of a slack adjuster directly into a compact actuator installed or used as tread break units. Before the development of the integrated slack adjuster, all TBUs either used an external slack adjuster, or needed to be adjusted manually which required continual and regular maintenance and calibration in order to keep the clearance between the tread wheel and the brake shoe constant, as this clearance would increase over time as a result of the wear and tear of the brake shoe caused by normal operation. The integrated slack adjuster eliminated the need for such cost-intensive maintenance and the mechanical parts needed to carry out the slack adjusting. This development also greatly increased the operating safety of railway cars by automatically keeping the clearance between the tread wheel and the brake shoe constant, and thereby ensured a uniform brake force and reaction time over the life of the brake shoe.

28.    This novel design reduced the required space in the truck frame, the number of required components, the overall weight and accordingly the engineering effort required to produce a TBU, which in turn reduced the costs and technical risks associated with the production of the newly engineered products and parts.

8

29.     The new design also reduced manufacturing costs by using standardized components and parts for as many applications as possible, and integrating the slack adjuster directly into the actuator used as a TBU.

30.     Furthermore, unlike previous actuators, the BFC is capable of functioning in a wide variety of applications such as freight and mass transit.  It can withstand a multitude of general operating and track conditions, as well as a broad range of external environmental conditions and provides a high level of reliability.

31.     BFC TBUs are composed of approximately 50 to 100 parts depending on the type of unit.  Faiveley Malmö, and its predecessor-in-interest SAB Wabco, spent many years experimenting with different designs and materials, made huge investments in financial and human capital, and devoted thousands of man-hours to develop a safe, reliable and effective actuator for all types of applications.  The BFC actuator family of products is the result of these extensive efforts.

32.     The first BFC TBU version was shipped to customers in 1976.  Over the years, the BFC TBU's design has been further refined and its development is ongoing to optimize performance, reliability, maintenance and production costs.  The fourth generation of this technology has been in production since 2006.  Over time, the BFC actuator family has been expanded to include a parking brake unit, a unit that can be used for disc brake applications, and even more compact versions of the original BFC TBU for use in applications with significant space limitations and for so-called "clasp-arrangements."

33.     As further developments and improvements were made by SAB Wabco to the BFC actuator  technology, the BFC product range has expanded.

9

34.    The BFC TBU's proven safety and reliability in providing flexible, slack-free braking solutions under a variety of road-tested operating conditions has led to its use by many of the largest metropolitan transit authorities and freight operators in North America. Faiveley has sold and installed over 150,000 units in more than 46 countries worldwide.

35.    BFCs are manufactured at the Faiveley Nordic site.

36.    As explained below, only BFCs manufactured in accordance with Faiveley Malmö's manufacturing drawings (containing the below-referenced trade secrets) will meet the high functionality and performance required of these products.

37.    In addition to providing the initial supply and installation of complete units for customers, the Faiveley Plaintiffs also provide spare parts, overhauls and service throughout the course of the BFC's operational life to ensure safety and reliability.

III.    **SAB WABCO'S INVENTION OF THE PB/PBA ACTUATORS**

38.    SAB Wabco also developed the PB and PBA actuators. The PB and PBA are brake cylinders which, similar to the BFC, are used to generate a brake force to slow and stop a railway vehicle. Both the PB and the PBA are pneumatic activated brake cylinders which can be used in a TBU application to generate the necessary force to push or pull the brake shoe to the wheel rim of a railway car. PB and PBA are also commonly used as disc brake applications.

39.    In instances where the PB and PBA are used as disc brake applications, the brake cylinder is installed in a brake caliper/rigging. The force generated by the PB or PBA is used through the caliper to push the brake pads towards the surface of a brake disc, which is

directly installed on an axle or wheel. This creates a friction force between the brake pads and the brake disc which slows and stops the railway car.

40.     Similar to a BFC, the force of a PB/PBA actuator is generated internally by an increase of the air pressure in the air chamber of the actuator inflated through the brake cylinder pressure pipe. The air pressure acts on an internal piston head; the force from the air pressure is transferred directly through the piston and the slack adjuster mechanism into a linear movement. This movement, either through the TBU arrangement or a caliper, establishes the force to slow or stop the railway car.

41.     Regardless of the type of application, as the clearance between the friction components (brake pad/brake shoe against brake disc/wheel rim) changes, it must be adjusted when the clearance exceeds certain values to ensure proper functioning of the brake. The PB and PBA (like the BFC) are equipped with integrated slack adjusters which make the necessary clearance modifications.

42.     The PB is equipped with a double-acting slack adjuster, which means that when the clearance value is above or below the designated level, it can adjust the clearance in either direction. The PBA is a single-acting slack adjuster, which adjusts only the exceeding clearance to restore the clearance to its pre-set value. Each of these slack adjusters works instantly during the application of the brake

43.     The PB is composed of approximately 80 parts. It was first developed by SAB Wabco in the 1970s to meet the demand for a compact, light-weight brake cylinder to be fitted into various trains, including high speed and commuter trains. Several modifications have been made to date to improve the performance, reliability and production costs associated with

the PB. The design and manufacture of the PB are the result of countless hours of engineering research and development.

44.     The PBA is made up of approximately 100 parts, depending on the type of actuator. Its development began in the mid-1980s. As is the case with the PB, a tremendous investment of man-hours was put into the design and manufacture of the PBA.

45.     As explained below, only PB and PBA actuators manufactured in accordance with Faiveley Malmö's manufacturing drawings (containing the below-referenced trade secrets) will meet the high functionality and performance required of these products.

46.     PBs and PBAs are manufactured at the Faiveley Amiens site. PBs are also manufactured at the Ellcon site.

47.     PB and PBA actuators and parts have been installed in railway cars around the world. The PB and PBA have been successful in significant part because they use slack adjusters, as opposed to stroke adjusters which have been made by competitors.

48.     Like the BFC, the PB and PBA require frequent overhauls, service, and spare parts during their operational lives to ensure safety and reliability.

B.      **Trade Secrets Involved in the Products**

49.     Faiveley Malmö has invested thousands of man-hours and spent significant amounts of money on designing the Products, and in developing the most effective, efficient methods for their manufacture. This effort included thousands of test hours in order to determine adequate tolerance ranges for the numerous Product components, adequate surface treatments for individual parts, individual part material composition and properties, and

appropriate machining processes. In addition, substantial human capital and thousands of hours of testing in laboratory and field applications were required to determine and validate the appropriate designs, materials, assembly procedures (such as the appropriate torques to be used in screwing parts together), the isolation and application of the right type of grease, the appropriate sequence of assembly and disassembly steps, and the required tools for assembly and testing.

50.    The trade secrets necessary to manufacture the Products are the result of this tremendous investment of financial and intellectual capital. These trade secrets can be found on the highly confidential and proprietary manufacturing drawings relating to the Products.

### 1.    The Manufacturing Drawings

51.    Faiveley Malmö's manufacturing drawings ("Manufacturing Drawings") contain the trade secrets that disclose the detailed design/geometry of the Products' component parts, their material specifications, tolerances, surface quality information and detailed manufacturing procedures. The Manufacturing Drawings are among Faiveley's most valuable trade secrets since they are the blueprints for making the various components for the Products. To protect the trade secrets contained therein, Manufacturing Drawings are marked with various "confidential" notations and disclaimers, and are provided to customers or third parties only in rare instances and then only with specific provisions limiting their use.

52.    The following information found on Faiveley Malmö's highly confidential and proprietary Manufacturing Drawings is necessary to produce, repair or overhaul the Products, and constitutes protectable trade secrets:

a.   Dimension, Form and Position Tolerances: The dimension tolerances of the Products are one of Faiveley Malmö's main categories of trade secrets. Tolerances define the permissible range of manufacturing dimensions to be achieved in production of the Products. The dimension tolerances define the permissible deviation of a dimension against the nominal dimension when it is produced. The "form" and "position" tolerances define the permissible deviations of the position and relation of surfaces, holes, etc. to specific references. Tolerances are key to the proper functioning and performance of the Products. The tolerances ultimately determine the functioning of each part or component in the system and the interaction among the various parts or components, especially for parts which are in direct contact with one another or must operate together. If one were to build a component with a different tolerance range, it would have a tremendous impact on the performance and life expectancy of the component, the interference between components and the performance of the complete unit. Moreover, the manufacturing costs of the Products can be significantly affected by the selected tolerance ranges of its component parts, since manufacturing parts within small tolerance ranges requires sophisticated machining (such as grinding) which, in turn, raises the cost of manufacturing and also potentially limits the possibility of machining the parts to the required specifications. The dimension tolerances, and the form and position tolerances, are found on the Manufacturing Drawings and cannot be ascertained simply by visually inspecting the Products.

b.   Material Specifications: Another important trade secret is the selection of the right materials for the Products' individual components. The selection of the optimum construction material heavily impacts the performance and life expectancy of the components. For example, selecting the wrong material can lead to cracks in the component's microstructure, or result in a "soft" component which cannot withstand normal wear and tear or the loads acting

on the component, which in turn can lead to costly parts replacement and/or retrofits. Material specifications may include directions to use a special type of additive to a material, or to apply a particular heat treatment. Material specifications can be found the Manufacturing Drawings and cannot be ascertained simply by visually inspecting the Products.

       c.    <u>Surface Finish Requirements</u>: Selection of the proper surface finish for a component is especially important when the surface must interact with other components, or the surface is otherwise involved in the proper functioning of the component (a so-called "functional" surface). When two or more parts interact, their surface quality determines the amount of friction between these parts. Choosing the correct surface quality for a functional surface is a trade secret that can significantly impact both the manufacturing cost and the life expectancy of the component part. This information is found on the Manufacturing Drawings and cannot be ascertained simply by visually inspecting the Products.

       d.    <u>Special Instructions</u>: Special instructions are additional manufacturing instructions required to produce key parts or components. They may specify a particular quality or geometry, or highlight certain actions required during production (such as a separate testing or how to arrange the pattern). This information can be found on the Manufacturing Drawings and cannot be ascertained simply by visually inspecting the Products.

      53.    Faiveley Malmö has expended a great deal of time, effort and money in developing the trade secrets for the Products and their component parts because of their potential impact on manufacturing costs, part performance and reliability.

      54.    The above-described trade secrets (collectively the "Trade Secret Material") are essential to the manufacture and assembly of the Products and their parts and

components.  A Product not built according to the Trade Secret Material would not provide the same performance features and reliability, and would likely fail during normal operation. Changing even one of the properties of the design of the Products would seriously affect their function, performance and reliability, leading to defects and significant additional costs for production and repair.

55.   As explained above, Faiveley Malmö has conveyed the Trade Secret Material related to the BFC to Faiveley Nordic so that Faiveley Nordic can manufacture the BFC.  Faiveley Malmö has also conveyed the Trade Secret Material related to the PB and the PBA to Faiveley Amiens for manufacturing purposes.   Additionally, to enable Ellcon's manufacture of the PB in the United States, Faiveley Amiens has conveyed the Trade Secret Material related to the PB with Ellcon.

### C.   Limited Access to Trade Secret Materials

56.   Access to the Trade Secret Material was and is restricted by Faiveley Malmö and the Faiveley Plaintiffs.  Only those Faiveley employees who need to refer to the Manufacturing Drawings during the course of their daily functions have access to these drawings.  Hard copies of the manufacturing drawings are kept in separate storage rooms (archives) with access limited only to those individuals with keys to the rooms.  To get access to these drawings, a person needs to have general permission (as part of his or her job description) or obtain specific permission from the responsible department manager.  The electronic versions of these files are stored on the local network servers and have restricted access.  To access these drawings, one needs first to enter the local network at the Faiveley, which requires a password and the corresponding "right" (i.e., user account with password) to access the section of the

16

server where the drawings are stored electronically. The right to access this section of the server is controlled by the department managers.

57.     In addition, Faiveley Malmö and the Faiveley Plaintiffs limit the use and dissemination of the Trade Secret Material by requiring employees with access to the Trade Secret Material to agree to employment contracts with confidentiality provisions, and by requiring all third parties (including Wabtec) to agree to strict non-disclosure provisions.

IV.     **RELATIONSHIP WITH WABTEC**

58.     In the early 1990's, SAB Wabco had no direct subsidiary or affiliate in the United States.

59.     Because of SAB Wabco's innovative and diverse product offerings, particularly with the actuator product portfolio, and the international reputation of and goodwill associated with SAB Wabco's products, SAB Wabco believed that there was a large potential market for its applications in the United States. SAB Wabco sought a U.S. partner with experience manufacturing and servicing railway car components, especially brake equipment.

60.     The former Wabco (now Defendant Wabtec) was selected as a licensee to market and sell the Products both because SAB Wabco and Wabco once had the same parent company, and because of Wabco's experience with railway car brake equipment. As a licensee of SAB Wabco's superior actuator technology, Wabco would be able to provide complete brake systems in the North American market with reliable truck-mounted equipment based on the SAB Wabco technology.

61.     This relationship was formalized in a license agreement executed on December 31, 1993 (the "License Agreement"), pursuant to which SAB Wabco licensed to Wabco almost the complete product range for the Products. Wabco was given an exclusive license to manufacture, assemble, use, lease, and sell the Products in North America.

62.     Faiveley Malmö acquired SAB Wabco's rights and responsibilities under the License Agreement in November 2004.

## V.     FAIVELEY'S TRADE SECRETS LICENSED TO WABTEC

### A.     Product Manufacturing

63.     With the License Agreement in place, Wabco was given access to all of SAB Wabco's intellectual property, including the Trade Secret Material and corresponding documents, relating to the Products. This information enabled Wabco to produce the parts required for the Products and provide technical support for the Products to the customers in North America.

64.     Because of its network in the United States, Wabco was able to service many of the largest transit authority customers easily and provide the required technical and commercial support for the Products. In turn, SAB Wabco ensured that Wabco received all the required information and support to manufacture, sell and service the Products.

65.     During the course of the License Agreement, Wabtec was permitted to make use of the Trade Secret Material in connection with the manufacture, marketing, sale and distribution of the Products. After termination of the License Agreement, Wabtec was not permitted (except in limited instances not applicable here) to make use of the Trade Secret Material to manufacture, market, sell or distribute the Products.

18

B.   **Original Equipment and Aftermarket Business**

66.   Acquiring Original Equipment Manufacturing ("OEM") business for the sale of complete new units of the products to car builders also normally means securing sales for spare parts, replacement units, overhaul, repair service, and maintenance in the traditionally profitable aftermarket business.  Securing the aftermarket business for the Products is especially important since they require frequent overhauls, spare parts, and replacements.

67.   The Products were well received by the North American market, and Wabco was successful in entering into OEM and aftermarket contracts to supply the Products for different types of vehicles operated in North America.

68.   For NYCT, Wabtec entered into several OEM contracts with various car builders to supply the BFC TBUs to be installed on various NYCT subway car lines, including the R142, R142A, R143 and R160 subway cars.  In addition, Wabtec entered into aftermarket contracts to supply spare parts and overhaul services, including one for the R142A Overhaul.

VI.   **TERMINATION OF THE RELATIONSHIP**

69.   In December 2004, SAB Wabco sent Wabtec a letter terminating the License Agreement.  At the same time, SAB Wabco requested that Wabtec provide written confirmation that Wabtec had met all of its obligation under the License Agreement, including its obligation to return all of SAB Wabco's confidential documents relating to the Products.

70.   Wabtec responded, acknowledging, *inter alia*, its obligation to inform Faiveley of all modifications and improvements to the Products, and stating that the requested documentation was being assembled and would be provided to Faiveley as soon as the compilation was completed.

71.     Since the termination, Faiveley Malmö and the Faiveley Plaintiffs have written Wabtec several times regarding the return of the documents relating to the Products. To date, Wabtec has still not confirmed that it is no longer in possession of the Faiveley confidential information and documents, including the Trade Secret Material, that it was required to return under the License Agreement.

## VII.   WABTEC'S MISUSE OF THE TRADE SECRET MATERIAL

72.     As the parties were unable to reach a new agreement, Faiveley USA, supported by Faiveley Nordic and Faiveley Amiens, started a marketing campaign in the fourth quarter of 2006 and first quarter of 2007. The first step in this marketing campaign was to inform the major transit authorities (*e.g.*, NYCT, Amtrak) and other customers that Faiveley USA would hereinafter be directly responsible for marketing, selling, and servicing the Products, and explaining that Wabtec would no longer be involved in such activities.

73.     Faiveley USA and (from August 2008) Ellcon began expanding their activities in the United States by visiting the technical and purchase departments of various major customers. They contacted the transit authorities directly to learn about the operation and condition of the units, and to address any technical questions or problems they might have regarding spare parts, overhaul, and service.

74.     At the end of May 2007, Faiveley USA received an envelope postmarked Spartanburg, South Carolina. An anonymous whistle-blower at Wabtec sent a copy of an internal Wabtec document labeled "Drafting Request" (*i.e.*, a work order), which requested internal modifications of certain drawings relating to the Products. The Drafting Request orders that several changes be made to various Faiveley Product parts. The modifications include

changing Faiveley Product part numbers to Wabtec part numbers, and altering the relevant Bills of Material to include the "new" Wabtec part numbers.  In addition, the Drafting Request states that parts already ordered from Faiveley should be restocked using the new Wabtec part numbers.  Finally, the Drafting Request orders that Faiveley part numbers made "obsolete" as a result of the "termination of the license agreement" be replaced with "new" Wabtec part numbers.

75.    The Drafting Request, which is dated March 29, 2007, was prepared by Wabtec well over a year after the termination of the License Agreement, and after Faiveley Malmö had made several requests to Wabtec for the return of all of its confidential information.

A.    **The NYCT Sole Source Procurement**

76.    NYCT is one of the most important transit authorities in North America, and indeed in the world, due to the size of its subway car fleet and continuous new car procurements.  As a result, NYCT is a highly desirable and sought-after customer.  In an effort to develop its business relationship with NYCT, Faiveley USA reached out to NYCT in late 2007 to discuss the BFC TBU installed in the NYCT subway cars.

77.    NYCT issued a Request for Proposal for NYCT Contract 06L9582 for the upgrade of the R142A (the "R142A Contract"), but this request was labeled a "sole source procurement" and invited only Wabtec to bid, despite the fact that the parts implicated were parts designed and manufactured to Faiveley's technical specifications and Trade Secret Material .

78.    The R142A Contract specifically called for the Products to be manufactured and delivered in accordance with the technical specifications of their original

21

equipment manufacturer.  Wabtec had originally obtained Faiveley's proprietary technical specifications and Trade Secret Material to manufacture the products called for by the R142A Contract pursuant to the License Agreement.  However, the License Agreement had terminated by the time of the R142A Contract and Wabtec no longer had any right to use the Trade Secret Material to bid for or supply the R142A Contract.

79.    In June 2007, Faiveley USA met with NYCT to discuss the R142A Contract.  Upon confirming that Wabtec intended to supply the R142A Contract, Faiveley USA became concerned that Wabtec was misappropriating Faiveley Malmö's trade secrets to steal customers in the North American market, including NYCT, that rightfully should have been purchasing from it.

80.    In July 2007, Faiveley USA submitted a bid for the R142A Contract.

81.    After receiving Faiveley USA's bid, NYCT informed Faiveley USA that it would award Wabtec the R142A Contract on a sole source procurement basis

82.    In view of NYCT's award of the R142A Contract to Wabtec, Faiveley USA filed a protest against NYCT's award of the R142A Contract to Wabtec.  Faiveley USA alerted NYCT to the fact that by fulfilling the R142A Contract, Wabtec was improperly using the Trade Secret Material after the termination of the License Agreement.

83.    In September 2007, NYCT rejected Faiveley USA's protest and reaffirmed its award of the R142A Contract to Wabtec, adding that it was not in a position to determine the ownership of the intellectual property rights at issue.

84.    As explained below, in October 2007, Faiveley Malmö commenced an arbitration in Sweden and a preliminary injunction proceeding in aid of that arbitration in the Southern District of New York.

B.    **Other Transit Authorities Undergoing Overhauls/Upgrades/Spares**

85.    In the fall of 2007, Wabtec began cancelling orders for parts used in various BFC units which were previously produced by Faiveley Nordic and supplied to Wabtec by Faiveley USA for resale during the term of the License Agreement.

86.    During Faiveley's ongoing marketing activity, it has learned that other transit authorities need spare parts and are looking for an overhaul of the Products. For example, there are over 25,000 BFC TBUs and more than 9,000 PB/PBAs installed on railway vehicles in use by various U.S. transit authorities, which require frequent overhauls and repairs.

87.    The Faiveley Plaintiffs continue to be confronted with marketing activities by which Wabtec seeks to provide spare parts and services for the Products which require the use of the Trade Secret Materials to provide the identical performance and reliability after the required service and overhauls.

VIII.   **PRIOR RELATED LEGAL PROCEEDINGS**

A.    **U.S. and Swedish Proceedings**

88.    On October 18, 2007, pursuant to the arbitration clause in the License Agreement, Faiveley Malmö filed an arbitration against Wabtec with the International Chamber of Commerce (the "Arbitration").

89.     On the same day, Faiveley Malmö filed an Application for a Preliminary Injunction and Expedited Discovery in Aid of a Pending Foreign Arbitration in the United States District Court for the Southern District of New York (the "U.S. Proceeding").

90.     The parties engaged in extensive discovery, which was used in both the Arbitration and the U.S. Proceeding.

91.     On August 22, 2008, having determined a likelihood of success on the merits of Faiveley Malmö's trade secret misappropriation claim against Wabtec and that Faiveley Malmö would suffer irreparable harm absent an injunction, the District Court in the U.S. Proceeding issued an Order enjoining Wabtec from: (1) providing NYCT with manufacturing drawings during the course of Wabtec's contract with NYCT, (2) entering into, or bidding for, any new contracts to manufacture, supply, or sell any BFC TBUs, or BFC TBU parts, kits or components, and (3) providing manufacturing drawings or other materials containing Faiveley Malmö's trade secrets to third parties, until a final decision was rendered in the Arbitration.

92.     On appeal, the Second Circuit vacated the District Court's Order and remanded the case for further proceedings on the issue of irreparable harm.  On remand, the District Court did not reinstate the injunction.

93.     In the meantime, the Arbitration was ongoing in Sweden.  Following several days of hearings and extensive briefing, the Arbitral Tribunal ("Tribunal") rendered its Final Award.  The Tribunal determined that Wabtec had misappropriated Faiveley Malmö's trade secrets.  The Tribunal entered an award in favor of Faiveley Malmö for both monetary relief and injunctive damages.  The Final Award provides, *inter alia*, that: (1) Wabtec was

ordered to pay damages in the amount of $3.9 million (plus interest) based on the amount of royalties due to Faiveley Malmö from January 1, 2007 to December 31, 2011; (2) Wabtec is permanently enjoined from using Faiveley Malmö's manufacturing drawings and the documentation appended to those drawings (except those necessary to fulfill "grandfathered" contracts); (3) Wabtec is required to return all copies of Faiveley Malmö's manufacturing drawings except those necessary to fulfill "grandfathered" contracts; and (4) Wabtec must keep confidential and prevent the disclosure of documents and/or information related to Faiveley Malmö's trade secrets.

94.     The Faiveley Plaintiffs were not parties to the Arbitration, and accordingly did not present claims to the Tribunal.

95.     There has been no prior judicial or arbitral determination of the claims that the Faiveley Plaintiffs assert herein.

## FIRST CAUSE OF ACTION
### Misappropriation of Trade Secrets
### (by Faiveley Nordic, Faiveley Amiens, and Ellcon against Wabtec)

96.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     The information relating to the design and manufacture of the Products described above constitutes trade secrets, and as such are entitled to protection.

98.     Faiveley Nordic has at all relevant times had possession of trade secrets relating to the BFC.

25

99.    Faiveley Amiens has at all relevant had possession of trade secrets related to the PBA and the PB.

100.    Since becoming a manufacturer of the PB, Ellcon has at all relevant times had possession of trade secrets related to the PB.

101.    The trade secrets described herein represent special knowledge and information that is vital to Faiveley Nordic's, Faiveley Amiens's, and Ellcon's business operations.

102.    The trade secrets are not generally known by or available to the public, and Faiveley Nordic, Faiveley Amiens and Ellcon derive economic value from the trade secrets not being generally known to or readily ascertainable by proper means by third parties who can obtain economic benefit from their use.

103.    Faiveley Nordic, Faiveley Amiens, and Ellcon have each taken substantial measures to guard the secrecy of such trade secrets.

104.    Wabtec has knowingly and willfully misappropriated, and is exploiting for its own economic advantage, the Trade Secret Material owned by Faiveley Malmö and possessed by Faiveley Nordic, Faiveley Amiens, and Ellcon.

105.    Wabtec's actions constitute trade secret misappropriation under the laws of the State of New York and other states.

106.    As a result, Faiveley Nordic, Faiveley Amiens, and Ellcon are entitled to compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial.

## SECOND CAUSE OF ACTION
### Unfair Competition
### (by the Faiveley Plaintiffs against Wabtec)

107.   The Faiveley Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108.   Wabtec's bad faith misappropriation of the Trade Secret Material and/or other highly confidential and proprietary material possessed by the Plaintiffs, and its improper use of such misappropriated material to compete with Plaintiffs, constitutes an unfair and unjustifiable attempt to profit from the labors, skills and expenditures of Plaintiffs.

109.   Wabtec's acts constitute unfair competition against the Faiveley Plaintiffs under the laws of the State of New York and other states.

110.   By virtue of Wabtec's unfair competition, the Faiveley Plaintiffs are entitled to compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial.

## THIRD CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations
### (by the Faiveley Plaintiffs against Wabtec)

111.   The Faiveley Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 110 of this Complaint as if fully set forth herein.

112.   As manufacturer of the BFC, Faiveley Nordic has a business relationship with transit authorities and car builders.

113.   As manufacturer of the PB and the PBA, Faiveley Amiens has a business

relationship with transit authorities and car builders.

114. As the North American distributor of the BFC, PB and PBA, Faiveley USA had a business relationship with transit authorities and car builders.

115. Ellcon has a business relationship with transit authorities and car builders as a manufacturer of the PB, and as the North American distributor of the BFC, PB and PBA.

116. The Faiveley Plaintiffs had a reasonable expectation of prospective contractual relationships with NYCT, other transit authorities and car builders which use, or may use, the Products.

117. Wabtec was aware of the Faiveley Plaintiffs' existing and potential relationships with transit authorities and car builders.

118. Wabtec has intentionally interfered (and continues to interfere) with those relationships by misappropriating Faiveley Malmö's Trade Secret Material and representing to NYCT, other transit authorities, and car builders that the Products were Wabtec's own.

119. Wabtec used dishonest, unfair and/or improper means to interfere with the Faiveley Plaintiffs' business relationships.

120. But for Wabtec's interference, the Faiveley Plaintiffs would likely have obtained additional business.

121. Wabtec's actions constitute tortious interference with prospective business relations under the laws of the State of New York and other states.

122. The Faiveley Plaintiffs have been injured by Wabtec's conduct.

123.   As a result, the Faiveley Plaintiffs are entitled to compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial.

## FOURTH CAUSE OF ACTION
### Tortious Interference with Prospective Economic Advantage
### (by the Faiveley Plaintiffs against Wabtec)

124.   The Faiveley Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 of this Complaint as if fully set forth herein.

125.   The Faiveley Plaintiffs had business relationships with various transit authorities and car builders.

126.   Faiveley Nordic has a business relationship with transit authorities and car builders as the manufacturer of the BFC.

127.   Faiveley Amiens has a business relationship with transit authorities and car builders as the manufacturer of the PB and the PBA.

128.   Faiveley USA had a business relationship with transit authorities and car builders as the North American distributor of the BFC, PB and PBA.

129.   Ellcon has a business relationship with transit authorities and car builders as a manufacturer of the PB, and the North American distributor of the BFC, PB and PBA.

130.   The Faiveley Plaintiffs had, and continues to have, a reasonable expectation of economic advantage with NYCT, other transit authorities and car builders which use, or may use, the Products.

131.   Wabtec was aware of the Faiveley Plaintiffs' existing and potential

29

relationships with transit authorities and car builders.

132. Wabtec has intentionally interfered (and continues to interfere) with those relationships by misappropriating Faiveley Malmö's Trade Secret Material and representing to NYCT, other transit authorities, and car builders that the Products were Wabtec's own.

133. Wabtec used dishonest, unfair and/or improper means to interfere with the Faiveley Plaintiffs' business relationships.

134. But for Wabtec's interference, the Faiveley Plaintiffs would likely have obtained additional business.

135. Wabtec's actions constitute tortious interference with prospective economic advantage under the laws of the State of New York and other states.

136. The Faiveley Plaintiffs have been injured by Wabtec's conduct.

137. As a result, the Faiveley Plaintiffs are entitled to compensatory and punitive damages in an amount exceeding $75,000 to be determined at trial.

### FIFTH CAUSE OF ACTION
#### Unjust Enrichment
#### (by the Faiveley Plaintiffs against Wabtec)

138. The Faiveley Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 137 of this Complaint as if fully set forth herein.

139. Wabtec improperly used confidential and proprietary information belonging to the Faiveley Plaintiffs to its economic advantage.

140. As a result of Wabtec's actions, the Faiveley Plaintiffs were precluded

from securing business for the Products.

141.    Equity and good conscience militate against allowing Wabtec to retain profits obtained from sales based on improper use of the Faiveley Plaintiffs' confidential and proprietary information.

142.    Wabtec should be disgorged of its unjust enrichment from the sales of the Products.  The Faiveley Plaintiffs are therefore entitled to profits from such sales, in an amount exceeding $75,000 to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Faiveley Plaintiffs respectfully request that this Court:

A.    Enter judgment for the Faiveley Plaintiffs and against Wabtec on Counts I, II, and III, IV and V of its Complaint and award damages to the Faiveley Plaintiffs in an amount to be determined at trial, together with interest, costs and attorneys' fees;

B.    Direct Wabtec, within 30 days of the entry of judgment, to

(i)    provide a full accounting of all Products sold by Wabtec from December 31, 2006 to present.

(ii)    provide to Faiveley a full accounting of any Trade Secret Material in its possession, custody, or control;

(ii)    provide to Faiveley a full accounting of any Trade Secret Material provided to third parties, including by identifying all third parties to whom any Trade Secret Material was disclosed;

(iii)    return to Faiveley any Trade Secret Material in its possession (excluding materials related to the "grandfathered" contracts); and

(iv)    use best efforts to obtain the return of any Trade Secret from the parties required to be identified by Wabtec pursuant to (ii) above.

C.    Require Wabtec to provide Faiveley with forensic images of any computer hard drives, computer disks, computer tapes or other electronic storage media on which any Faiveley trade secrets were stored for any period of time, that are in its possession, custody or control;

D.    Award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 38(b), the Faiveley Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
         May 14, 2010

MAYER BROWN LLP

By:   _A. John P. Mancini_____
       A. John P. Mancini
       Vanessa M. Biondo
       1675 Broadway
       New York, New York 10019
       (212) 506-2500

*Attorneys for Plaintiffs Faiveley Transport USA, Inc., Faiveley Transport Nordic AB, Faiveley Amiens SA, and Ellcon National, Inc.*