gUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



```
------------------------------------ x
FAIVELEY TRANSPORT USA, INC.,         :
FAIVELEY TRANSPORT NORDIC AB,         :
FAIVELEY TRANSPORT AMIENS S.A.S., and :
ELLCON NATIONAL, INC.,                :
                                      :
              Plaintiffs,             :
                                      :      10 Civ. 4062 (JSR)
              -v-                     :
                                      :      OPINION AND ORDER
WABTEC CORPORATION,                   :
                                      :
              Defendant.              :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

        Plaintiffs Faiveley Transport USA, Inc. ("Faiveley USA"),
Faiveley Transport Nordic AB ("Faiveley Nordic"), Faiveley Transport
Amiens S.A.S. ("Faiveley Amiens"), and Ellcon National, Inc.
("Ellcon"), collectively the "Faiveley plaintiffs," bring this action
against defendant Wabtec Corporation ("Wabtec") asserting claims
based on Wabtec's alleged misappropriation of trade secrets from an
entity affiliated with plaintiffs, Faiveley Transport Malmö AB
("Malmö").  On June 25, 2010, Wabtec moved to dismiss the plaintiffs'
Amended Complaint pursuant to Federal Rules of Civil Procedure
12(b)(6) and 19.  By Order dated August 30, 2010, the Court denied
Wabtec's motion.  See also Opinion dated November 29, 2010.
Following discovery, both sides moved for summary judgment.  By
"bottom-line" order dated April 13, 2011, the Court granted

1

plaintiffs' motion with respect to defendant's liability on plaintiffs' claims for misappropriation, unfair competition, and unjust enrichment, denied plaintiffs' motion with respect to defendant's liability on plaintiffs' claim for tortious interference, and denied defendant's motion in its entirety.  This Opinion and Order sets forth the reasons for these rulings and reconfirms the remaining schedule of this case.

By way of brief background, this action relates to earlier litigation before this Court, in which Malmö sought a preliminary injunction prohibiting Wabtec from undertaking various activities pending the resolution of an arbitration of the parties' dispute in Sweden before an arbitral tribunal of the International Chamber of Commerce.  See Faiveley Transport Malmö AB v. Wabtec Corp., 572 F.Supp.2d 400 (S.D.N.Y. Aug. 22, 2008).  After a five-day evidentiary hearing, the Court held that Malmö was likely to succeed on the merits on its claim for trade secret misappropriation -- a finding later affirmed by the Second Circuit.  See Faiveley Transport Malmö AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009).  On remand from the Second Circuit, however, the Court declined to preliminary enjoin Wabtec's use of those trade secrets, finding that Malmö had failed to demonstrate that it would be irreparably harmed absent an injunction. See In re Faiveley Transport Malmö AB. 2009 WL 3270854 at *5 (S.D.N.Y. Oct. 7, 2009).

On December 12, 2009, the arbitral tribunal entered an award in Malmö's favor and granted both monetary relief and injunctive remedies.  See Declaration of John Mancini, dated December 10, 2010 ("Mancini Decl.") Ex. 17 (the "Award") at ¶¶ 797, 884.  The tribunal found, among other things, that Wabtec had continued to use Malmö's trade secrets after the expiration of its license agreement, and that its process of reverse engineering those secrets was tainted.  See id. at ¶¶ 788-97, 884.  Malmö moved for confirmation of the award, and, following briefing, this Court confirmed the award by Order dated May 10, 2010.  See In re: Faiveley Transport Malmö AB, 08 Civ. 3330 (S.D.N.Y. May 10, 2010).

During the arbitration between Malmö and Wabtec, the parties disputed whether Malmö could assert and recover damages on behalf of the separate Faiveley corporate entities that were also harmed by Wabtec's misappropriation of trade secrets.  See Award ¶ 552.  The tribunal ultimately adopted Wabtec's position and, though awarding damages to Malmö of roughly $3.9 million, ruled that it was outside the scope of the tribunal's powers to consider damages suffered by other Faiveley entities.  Id. ¶¶ 881-82.  In so doing, however, the tribunal noted that the bulk of the damages caused by Wabtec's misappropriation were suffered by the instant plaintiffs, and suggested, in effect, that these damages might be recovered in a separate action.  See Award at ¶ 887 (stating that "it is obvious

3

that most of the damages suffered as a consequence of the breach of the License Agreement and the misappropriation of the trade secrets have been suffered by Faiveley USA" and that the damages awarded by the tribunal do not include "the damage likely to have been suffered by" other Faiveley entities).

Against this background, the Court turns to the facts (undisputed except where indicated) pertinent to the instant motions. In November 2004, Faiveley Transport acquired a company known as SAB Wabco Group AB ("SAB"), which designed and manufactured brake equipment and other components of railway cars.  Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 8; Defendant's Response Statement Pursuant to Local Rule 56.1 ("Def. Opp. 56.1") at 5.  Malmö is the successor-in-interest to SAB's intellectual property rights, and thereby owns the trade secrets underlying the brake products at issue in this case, namely the Brake Friction Cylinder, the PB actuator, and the PBA actuator (collectively, the "Products"). Defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 43; Plaintiffs' Response Statement Pursuant to Local Rule 56.1 ("Pl. Opp. 56.1") at 32.  The instant plaintiffs, collectively, presently possess the exclusive license to manufacture, use, sell, and market the Products in North America.  See Def. 56.1 ¶ 44; Pl. Opp. 56.1 at 33; see also Declaration of Daniel K. Winters, dated Dec. 10, 2010 ("Winters Decl.") Ex. 25.  In particular, Faiveley Nordic and Ellcon

4

are the only entities that manufacture and sell the Brake Friction
Cylinder to North American customers; Faiveley Amiens and Ellcon are
the only entities that manufacture and sell the PB and PBA actuator
in North America; and Ellcon is the exclusive distributor of the
Products in North America.  Id.

By agreement executed on December 31, 1993 (the "license
agreement"), SAB licensed the intellectual property rights to the
Products to a company called Wabco.  Mancini Decl. Ex. 26 ("SAB-Wabco
License Agreement").  The license agreement provided Wabco with the
rights to manufacture, sell, and distribute the Products in North
America.  Pl. 56.1 ¶ 75-77; see Def. Opp. 56.1 at 34.  Among the
materials covered by the license agreement were "Manufacturing
Drawings" for the Products, which enabled Wabco to manufacture the
parts required for the Products.  Pl. 56.1 ¶ 77; see Def. Opp. 56.1
at 35.  Defendant Wabtec purchased the North American railway assets
of Wabco, and accordingly, assumed Wabco's rights and
responsibilities under the license agreement.  Pl. 56.1 ¶ 78; Def.
56.1 Opp. at 34.

Under the terms of the license agreement, Wabtec was
obligated to "cease manufacture of the License Products, subject only
to the entitlement to [fulfill] contracts entered into . . . before"
the agreement was terminated, on December 31, 2006.  SAB-Wabco
License Agreement ¶ 22.2.1.  Since that time, however, Wabtec has

entered into over a dozen contracts in the North American market to supply the Products to transit authorities such as the New York City Transit ("NYCT") and Amtrak.  Pl. 56.1 ¶ 94; Def. Opp. 56.1 at 44. Wabtec fulfills these contracts by exploiting what it claimed were "reverse engineered" versions of the Manufacturing Drawings that were first supplied to them by SAB in accordance with the SAB-Wabco License Agreement.  Pl. 56.1 ¶ 124; Def. Opp. 56.1 at 55.[1]

Wabtec made three attempts to reverse engineer the Manufacturing Drawings.  Pl. 56.1 ¶ 99-104; Def. Opp. 56.1 at 44-45. The first two -- in 2005 and 2006 respectively, and for which Wabtec retained outside companies -- both failed.  Id.  The third attempt -- starting in mid-2007 and continuing until January 2009 -- was far more successful, in that it yielded most "of the parts necessary to manufacture the Products."  Def. Opp. 56.1 at 55; see Pl. 56.1 at ¶ 123.  This, as the tribunal found, was because the third attempt was tainted by misuse of plaintiffs' trade secrets.  See Award ¶ 796.

Specifically, Wabtec's third attempt utilized the efforts of Wabtec employees who were familiar with the Manufacturing Drawings. See Pl. 56.1 ¶¶ 99-124; Def. Opp. 56.1 at 44-55.  Several of these employees, such as Roland Moore, the Lead Engineer in Wabtec's Brake

---

[1] Wabtec, citing only to the tribunal's Award, wrongly asserts that it was "expressly . . . authorized to use its reverse-engineered drawings" in this manner.  See Def. Opp. 56.1 at 42, 44.  The record is clear, however, that the tribunal found that Wabtec's reverse-engineered drawings were "tainted," but refrained from enjoining their use because it found that monetary damages were adequate to remedy the harm suffered by Malmö.  See Award ¶ 902.

Group, had extensive experience working with the Manufacturing
Drawings under the terms of the SAB-Wabco License Agreement.  Pl.
56.1 ¶ 107-114; Def. Opp. 56.1 at 47-49.  It is undisputed that Moore
made detailed comments on drafts of at least fifty of the reverse
engineered drawings, and that he, at minimum, identified significant
errors and inadequacies in those drawings.  Def. Opp. Mem. at 50-54;
Pl. 56.1 ¶¶ 117, 119-20 (alleging that Moore also "made substantial
changes" and "added necessary missing information" to those
drawings).  It is also undisputed that at least one other Wabtec
employee, the draftsman who prepared the final reverse engineered
drawings, had also worked with the Manufacturing Drawings under the
SAB-Wabco License Agreement.  Pl. 56.1 ¶ 112; Def. Opp. 56.1 at 49
(alleging that this employee "does not retain specific knowledge of
the drawings" that he drafts).  In addition, one of the outside
contractors Wabtec hired to assist with the third reverse engineering
attempt was a company called Rail Trail Consultants.  This company
was headed by a former Wabtec employee, Dallas Spadaro, who had
worked with the Manufacturing Drawings extensively during his time at
Wabtec.  Pl. 56.1 ¶¶ 105-06 (noting that Spadaro had authored a 221
page paper guaranteeing the safety of the Brake Friction Cylinder to
NYCT); Def. Opp. 56.1 at 46 (alleging that Spadaro's familiarity with
the Manufacturing Drawings was "at the system level" and so he did
not have pre-existing knowledge that was helpful in reverse

engineering the Drawings).  Finally, there is no dispute that Moore
and other Wabtec employees had access to the Manufacturing Drawings -
- each of which remained on an internal Wabtec electronic database
until it was replaced by its reversed-engineered counterpart --
during at least some of the time period in which they were working to
reverse-engineer those Drawings.  Pl. 56.1 ¶¶ 118, 121; Def. Opp.
56.1 at 52, 54 (alleging that no Wabtec employee, other than those in
Wabtec's IT Department and Paul Jamieson, Wabtec's Chief Engineer for
its Passenger Transit Division, "actually accessed" the Manufacturing
Drawings during the pendency of the reverse-engineering process).

Separately, during the course of the SAB-Wabco License
Agreement, Wabtec labeled the Products as its own, on the theory
that, even though it did not own the intellectual property on which
the Products were based, Wabtec had physically manufactured them.
Pl. 56.1 ¶¶ 125, 128; Def. Opp. 56.1 at 56.  Plaintiffs allege that
they lost at least one contract, with New Jersey Transit ("NJT"),
because of confusion generated by Wabtec's labeling practices, a
contention that Wabtec disputes.  See Pl. 56.1 ¶ 143; Def. Opp. 56.1
at 63-64.[2]

_____

[2] In addition, Wabtec has made disparaging comments about the
Faiveley plaintiffs to prospective customers, and Wabtec at one point
instructed its employees to refuse to assist the Faiveley plaintiffs
in addressing maintenance problems that the NJT was having with a
product that Wabtec had manufactured.  Pl. 56.1 ¶¶ 140-41, 144-45;
Def. Opp. 56.1 at 60-63.

As of the present date, Wabtec continues to sell the reverse-engineered Products, supply reverse-engineered spare parts for the Products, service those reverse-engineered products, and bid for contracts on the basis of the reverse-engineered Products.  Pl. 56.1 ¶¶ 147-49; Def. Opp. at 64-65.  In one example of particular note, in 2007 the NYCT awarded a valuable contract (to overhaul and upgrade certain subway cars) to Wabtec over Faiveley USA.  Pl. 56.1 ¶¶ 131-36; Def. Opp. 56.1 at 58-59.  In response, Faiveley USA filed a protest with the NYCT, alleging that Wabtec planned to use the tainted reverse-engineered Products to fulfill its contractual obligations with NYCT.  Pl. 56.1 ¶¶ 135, 138; Def. Opp. 56.1 at 59-60.  NYCT responded that it was not in a position to determine the ownership of intellectual property rights, and that NYCT's reliance on Wabtec's assertions that it lawfully owned those rights was reasonable in the absence of definitive evidence to the contrary.  Pl. 56.1 ¶ 137; Def. Opp. 56.1 at 59.

The Court now turns to the instant motions.  Wabtec's summary judgment motion is little more than a thinly disguised attempt to relitigate issues it already lost on its motion to dismiss.  First, Wabtec "renews" its argument, previously made in its motion to dismiss, that the Faiveley plaintiffs waived their right to assert any claims against Wabtec by statements made during the course of the arbitration tribunal's proceedings.  See Opinion dated November 29,

2010 ("MTD Opinion") at *5-7.  To support this argument, Wabtec

relies exclusively on a witness statement submitted to the Tribunal

by Xavier de Lavallade, Faiveley Transport's general counsel.  See

Winters Decl. Ex. 19 ("de Lavallade Witness Statement") at 1.  While

the Court denied this aspect of Wabtec's motion to dismiss on the

basis that de Lavallade's witness statement, "regardless of its

substantive import, is not properly considered by the Court on a

motion to dismiss," it also concluded that

> . . . even if the Court were to consider the witness statement,
> Wabtec's waiver argument would still fail.  Under applicable New
> York law, one's intent to relinquish one's legal rights must be
> "clear, unmistakable, and without ambiguity" in order to
> constitute a waiver of those rights . . . .  [T]he Court
> concludes that the letter was not intended as a general
> relinquishment of the Faiveley plaintiffs' legal rights.
> Rather, the Court interprets the letter[] . . . as referring to
> the state of affairs that would have resulted if the Tribunal
> had awarded damages to Malmö on behalf of the Faiveley
> plaintiffs, which it did not.

MTD Opinion at *7 (citations omitted).  The Court reconfirms these

conclusions.  Indeed, against the background of the full tribunal

record, it now is apparent that de Lavallade was simply attempting to

reassure the tribunal that the instant Faiveley entities would not

attempt to seek duplicative awards of damages in different fora for

the same harm -- a concern that Wabtec had explicitly articulated to

the tribunal and that the tribunal expressly adopted as its reason

for not allowing Malmö to recover on behalf of its affiliates.  See

Award ¶ 882 (holding that "[Malmö] is only entitled to claim the

damages that it has suffered itself . . . [and] to decide otherwise
might lead to a situation where [Wabtec] might be condemned to pay
damages suffered by other entities of [the Faiveley] group, while
those other entities would not be bound by the res judicata effect of
the award and would still be entitled to claim damages against
[Wabtec] before another jurisdiction."). In any event, there was no
waiver.

Second, Wabtec renews its argument, which the Court also
found unpersuasive at the pleadings stage, that the Faivelely
plaintiffs' claims are barred by res judicata. While Wabtec marshals
a wide array of evidence from the summary judgment record to support
its formulaic contention that the Faiveley plaintiffs and Malmö are
"in privity" with one another, see Defendant Wabtec Corporation's
Memorandum of Law in Support of its Motion for Summary Judgment
("Def. Mem.") at 3-5, or share a "commonality of interests," see id.
at 6, nothing in the summary judgment record negates the obvious
point that the tribunal expressly barred Malmö from either asserting
claims or recovering damages on behalf of the instant plaintiffs in
the arbitration. See Award ¶ 877. Under the most elementary
principles of res judicata, "a final judgment on the merits" only
"precludes the parties or their privies from relitigating issues that
were or could have been raised in that action." Allen v. McCurry,
449 U.S. 90, 96, n. 8, (1980) (emphasis added). Accordingly, the

11

instant plaintiffs' alleged willingness to allow their common interests to be represented by Malmö before the tribunal is irrelevant.  As the tribunal expressly precluded Malmö from recovering on Faiveley plaintiffs' behalf in the arbitration proceeding, a ruling which was in large part precipitated by Wabtec's representations to the tribunal that res judicata would not bar the Faiveley plaintiffs' from raising their claims in the instant action,[3] res judicata poses no bar to those claims.

The Court has considered Wabtec's other arguments (some of which are discussed below) in support of its summary judgment motion and finds them similarly unpersuasive.  Accordingly, the Court denies Wabtec's summary judgment motion in its entirety.

Turning then to the Faiveley plaintiffs' motion, the Court first considers their argument that Wabtec should be collaterally estopped from contesting that it misappropriated Malmö's trade secrets, an issue that the arbitral tribunal decided adversely to Wabtec.[4]  By preventing parties from contesting matters they have had

---

[3] This leads to the second reason why Wabtec's persistence in asserting that res judicata bars the instant action must fail: by this Court's express Order, "Wabtec is judicially estopped from arguing that res judicata bars plaintiffs' claims in this action, as that argument is directly contrary to arguments Wabtec made and prevailed on during the arbitration."  MTD Opinion at *9-10.

[4] For purposes of collateral estoppel, the findings of an arbitral tribunal are equivalent to findings of a Court.  See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. N.Y. 1997).

a full and fair opportunity to litigate, the doctrine of collateral estoppel "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources and fosters judicial reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-154 (1979). Collateral estoppel precludes relitigation of an issue when (1) the issue in both proceedings is identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) the party against whom it is being asserted had a full and fair opportunity to litigate the issue in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa SA, 56 F.3d 359, 368 (2d Cir. 1995). Moreover, where, as in this case, a plaintiff invokes collateral estoppel "offensively" against a defendant, courts have "broad discretion to determine when it should be applied," in the interests of preventing gamesmanship by the plaintiff and protecting against unfairness to the defendant. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330-31 (1979) (noting that the "general rule" is that collateral estoppel should not be invoked "where a plaintiff could easily have joined in the earlier action" or where doing so "would be unfair to a defendant").

Here, however, the Court finds that it is altogether proper
to collaterally estop Wabtec from contesting the arbitral tribunal's
finding that it misappropriated Malmö's trade secrets.  It is beyond
dispute that this issue was "actually litigated and decided" by the
tribunal, that Wabtec had a "full and fair opportunity" to litigate
the issue, and that the issue was "necessary to support a valid and
final" award on the merits.  See Defendant Wabtec Corporation's
Memorandum of Law in Opposition to Plaintiffs' Motion for Partial
Summary Judgment ("Def. Opp. Mem.") at 3-5.  Moreover, the Court
concludes that the interests of both fairness and judicial economy
militate against allowing Wabtec to relitigate the issue of whether
it misappropriated Malmö's trade secrets when that issue was fully
litigated in the arbitration, and the unfairness would therefore be
to plaintiffs if Wabtec were to be given the proverbial "second bite
of the apple" on something so fully litigated already.

The only colorable basis on which Wabtec contests the
applicability of collateral estoppel is its assertion that there are
material differences between New York and Swedish law (the law which
the tribunal applied) in terms of defining what constitutes a "trade
secret."  See id.; see also Computer Assocs. Int'l, Inc. v. Altai,
Inc., 126 F.3d 365, 371 (2d Cir. 1997) (holding that, for purposes of
collateral estoppel, identity of issues means that "the legal
standards governing their resolution are not significantly

14

different."); <u>Alfadda v. Fenn</u>, 966 F. Supp. 1317, 1330-31 (S.D.N.Y. 1997) (relevant issues of law and fact in the previous action must be "sufficiently identical to the issues the [instant] plaintiffs would have to establish to sustain their . . . claims") <u>aff'd</u> 159 F.3d 41 (2d Cir. 1998).  In particular, Wabtec argues that Swedish and New York trade secret law "differ[] dramatically" in terms of the standard by which disclosure of the relevant information or material to third parties causes a trade secret to lose its character as such. Def. Mem. at 13.

Plaintiffs respond, however, that any differences between Swedish and New York trade secret law are irrelevant to the instant dispute, because the tribunal made specific factual findings that are more than adequate to support a finding that the information contained in the Manufacturing Drawings constitute trade secrets under New York law.  New York law defines a trade secret as:

> any formula, pattern, device, or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it.  <u>N. Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 43-44 (2d Cir. 1999).

In determining whether information constitutes a trade secret under this general formulation, New York courts consider six factors:

1. The extent to which the information is known outside of the business;
2. The extent to which it is known by employees and others involved in the business;
3. The extent of measures taken by the business to guard the secrecy of the information;

4. The value of the information to the business and its competitors;

5. The amount of effort or money expended by the business in developing the information;

6. The ease or difficulty with which the information could be properly acquired or duplicated by others.

Ashland Mgmt., Inc. v. Janien, 82 N.Y.2d 395, 407 (N.Y. 1993).   The tribunal -- after lengthy deliberations -- made express factual findings with respect to each of the above elements.[5] As to the first factor, it stated that "[t]aking into consideration the undisputed fact that the Respondent has invested a lot of time and money in a very substantial reverse engineering project, it is clear that the information contained in the drawings was not generally available." Award ¶ 748. As to the second, it found that "only certain authorized [Malmö] employees were allowed to access [hard copies] of the manufacturing drawings]," and that "the electronic versions of the drawings are password protected and only the user of accounts of certain employees would allow access thereto." Id. ¶ 745. As to the third, the tribunal found that the Malmö "has at all

---

[5] In addition, when the issue was first raised during preliminary injunction proceedings, the Second Circuit affirmed this Court's finding that the "manufacturing drawings . . . contain trade secrets under New York law." See Faiveley Transport Malmö v. Wabtec, 559 F.3d 110, 117 (2d Cir. 2009).   Though findings of fact made by a court at preliminary injunction proceedings are not binding on later proceedings, see University of Texas v. Camenisch, 451 U.S. 390, 395 (1981), they are entitled to persuasive weight when adjudicating the merits of a dispute, see, e.g., Malletier v. Dooney & Bourke. Inc., 561 F. Supp. 2d 368, 381 (S.D.N.Y. 2008), and they are equally relevant to the issue here of whether to apply collateral estoppel despite supposed differences between New York and Swedish law.

times kept the drawings secret" by, for example, requiring employees and suppliers with access thereto to sign formal agreements ensuring their confidentiality. Id. ¶ 745; see id. ¶¶ 745-50. As to the fourth, the tribunal found that "it is clear that information contained in the drawings . . . offered a competitive advantage for [Malmö]," id. ¶¶ 748, 750, and that "the divulgation [of the drawings] could cause . . . damage to Faiveley from the point of view of competition," id. ¶ 744-45. As to the fifth, while the tribunal did not expressly consider the level of resources that the Faiveley group expended to develop the information, it did find that "it is common ground that the value of the sales of the relevant parts and products amounts to several million US dollars a year." Id. ¶ 748. Finally, as to the sixth factor, the tribunal noted the "undisputed fact" that Wabtec has invested "a lot of time and money in a very substantial reverse engineering project," which twice failed and only succeeded on the third try by means of a tainted process. Id. ¶¶ 748, 796.

On the basis of the foregoing, the Court concludes that, even adopting Wabtec's interpretation of Swedish law,[6] the alleged distinction between Swedish and New York law is no bar to application of collateral estoppel in this case. Cf. Benjamin v. Traffic

---

[6] The Court notes that, while the parties dispute the requirements of Swedish law in their briefing papers, neither party effected proper notice of their intent "to raise an issue about a foreign country's law," as required by Federal Rule 44.1. Fed. R. Civ. P. 44.1.

17

Executive Association-Eastern Railroads, 688 F. Supp. 903, 908
(S.D.N.Y. 1988) (holding that issues in both proceedings are
identical when the underlying facts are identical).  Accordingly,
Wabtec is collaterally estopped from disputing the tribunal's finding
that: (1) Wabtec "continued to use [Malmö's] manufactured drawings .
. . in breach of the License Agreement," Award ¶ 777; and (2)
Wabtec's process for reverse engineering those secrets was "tainted"
by, inter alia, the involvement of Wabtec employees -- particularly
Roland Moore, who was "very knowledgeable about [the] trade secrets
and manufacturing drawings" as a result of his firsthand experience
working with them under the SAB-Wabco License Agreement, and "had
them at [his] disposal during the whole reverse engineering process."
Id. ¶ 796.  The Court concludes, however, that the tribunal's
speculation regarding the extent of damages suffered by the instant
plaintiffs as a result of this misappropriation, see Award ¶ 887, was
not "actually litigated and decided" by the tribunal, and is
therefore not subject to estoppel.  See id.

Keeping the foregoing in mind, the Court now considers
whether plaintiffs are entitled to summary judgment on each of their
individual claims.  In order to succeed on their first claim, for
misappropriation of trade secrets, the Faiveley plaintiffs must
establish "(i) that [plaintiffs] possessed a trade secret and (ii)
that the defendant[] used that trade secret in breach of an

18

agreement, a confidential relationship or duty, or as a result of discovery by improper means." N. Atlantic Instruments. Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). In yet another reprise of arguments the Court found unconvincing at the pleadings stage, Wabtec argues that plaintiffs' claim for trade secret misappropriation must be dismissed because they cannot establish "possession" of the pertinent trade secrets, as no individual Faively plaintiff possesses an exclusive license to the trade secrets. Winters Decl. Ex. 25 (conveying licenses "to make, use sell, service and offer for sale the contract Products in [North America]" from Malmö to the instant plaintiffs on a "non-exclusive, royalty-free basis").

In the Court's earlier Opinion denying Wabtec's motion to dismiss the complaint, it rejected this argument on the ground that the "Faiveley plaintiffs allege that they [collectively] have the exclusive rights to manufacture, use, assemble, sell, and market the Products that are the subject of this action." MTD Opinion at *16. Discovery has now confirmed the exact nature of the plaintiffs' rights to the trade secrets at issue in this suit. In particular, Faiveley Nordic and Ellcon are the exclusive manufacturers and distributors of the Brake Friction Cylinder to North American customers, and Faiveley Amiens and Ellcon are the exclusive manufacturers and distributors of the PB and the PBA to those customers. See Def. 56.1 ¶ 44; Pl. Opp. 56.1 at 33. While no

19

individual plaintiff thus possesses an exclusive license to all the
trade secrets here in issue, collectively they have such exclusivity.
As such, Wabtec's contention that a finding of "possession" in the
instant case would necessarily entail granting "a potentially
limitless number of nonexclusive licensees . . . [the right to]
assert misappropriation claims based on the same trade secret," Def.
Opp. Mem. at 14, is utterly without merit.  The Court therefore
concludes that plaintiffs have demonstrated sufficient "possession"
of the relevant trade secrets to recover for Wabtec's
misappropriation of those secrets.  Further, the Court observes that
the arbitration tribunal's finding that Wabtec reverse-engineered the
trade secrets by means of a tainted process -- a finding that Wabtec
is collaterally estopped from disputing, see supra -- clearly
suffices to satisfy the second element of a trade secret
misappropriation claim under New York law, viz., that the defendant
"must [have] used that trade secret" inter alia, "as a result of
discovery by improper means."  Haber, 188 F.3d at 44.  Accordingly,
plaintiffs are entitled to summary judgment on the issue of
defendant's liability for misappropriation.

Turning next to the Faiveley plaintiffs' claim for unfair
competition, the Court notes that, under New York law, "[t]he essence
of an unfair competition claim . . . is that the defendant has
misappropriated the labors and expenditures of another . . . [in] bad

20

faith." Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037,
1044 (2d Cir. 1980); see also Berman v. Sugo, LLC, 580 F. Supp. 2d
191, 208 (S.D.N.Y. 2008) (to succeed on a claim of unfair competition
"a plaintiff need only show that defendants misappropriated its
product, labors, skills, expenditures or goodwill, and displayed some
element of bad faith doing so"). Accordingly, it is well established
that, where an unfair competition claim and a misappropriation claim
arise from the same factual predicate, as in this action, "the two
claims generally rise or fall together." Scientific Components v.
Sirenza Microdevices, Inc., 2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006);
see also Atmospherics, Ltd. v. Hansen, 702 N.Y.S.2d 385, 386 (N.Y.
App. Div. 2000). Wabtec -- again renewing substantially identical
arguments on summary judgment to those it asserted on its failed
motion to dismiss -- argues that the only "labor, skills and
expenditures" alleged to have been misappropriated are those of
Malmö, not the Faiveley plaintiffs. Def. Mem. at 18. Under New York
law, however, a party asserting an unfair competition claim need only
have "a colorable property or pecuniary interest" in the intellectual
property at issue to state a claim. Berni v. Int'l Gourmet
Restaurants of Am., Inc., 838 F.2d 642, 648 (2d Cir. 1988). Because
plaintiffs collectively possess the exclusive rights to manufacture,
use, assemble, sell, and market the Products in North America, the
Court adheres to its earlier ruling that their interests in the

21

underlying trade secrets "are sufficiently remunerative to constitute 'a colorable ... pecuniary interest' under Berni." MTD Order at *18. Moreover, the findings of the tribunal likewise establish bad faith. See Award ¶¶ 791-92, 794. Accordingly, the Court concludes that the Faiveley plaintiffs are entitled to summary judgment establishing defendant's liability for unfair competition.

Plaintiffs' third claim, for tortious interference with prospective economic advantage,[7] which requires a showing that: (1) plaintiffs' "had a [particular and existing] business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003). Wabtec first argues that this claim must be denied with respect to Faiveley Nordic and Faiveley Amiens because neither entity has direct contractual relationships with North American transit authorities. Def. Mem. at 19-21. In support of its position, defendant relies on Kirch v. Liberty Media Corp., 449 F.3d 388 (2d Cir. 2006). In that case, the Second Circuit held that an agent cannot recover for a third-party's

---

[7] Although plaintiffs seek recovery for both "tortious interference with prospective economic advantage" and "tortious interference with prospective business relations," there does not appear to be any distinction between the claims with respect to the applicable legal standards or the available recovery. See, e.g., Henneberry v. Sumitomo Corp. of America, 532 F. Supp. 2d 523, 541 n.12 (S.D.N.Y. 2007).

22

tortious interference with his principal's transactions where the
agent's claim was premised exclusively on his allegation that the
tortious interference led to the principal's insolvency, thus causing
the agent to lose business.  Id. at 400 (finding that the agent's
harm, in those circumstances, was impermissibly "derivative").  The
Second Circuit specifically emphasized, however, that its holding did
not encompass situations where the entities, as in this case, are
affiliates.  See id. at 401 ("[the agent] does not assert that it is
owned by [the principal] or that the two companies share senior
management").  Further, the Court noted that some indirect business
relationships -- even if not memorialized in a contract -- are
sufficient for a plaintiff to recover for tortious interference.  Id.
citing Brown v. AXA RE., 2004 WL 941959 (S.D.N.Y. May 3, 2004)
(finding that plaintiffs who negotiated a contract, but were not
parties to it, could recover for tortious interference with that
contract); TVT Records v. Island Def Jam Music Group, 279 F.Supp.2d
366 (S.D.N.Y 2003) (allowing subsidiary of a company whose copyrights
were infringed to bring an action for tortious interference with a
contract, even though the subsidiary was neither a party to, nor a
third-party beneficiary of, that contract).  Here, Faiveley Amiens
and Faiveley Nordic -- as manufacturers of the Products -- are the
direct pecuniary beneficiaries of the business relationships of their
affiliates (Faiveley USA and Ellcon) with North American transit

authorities.  Mancini Decl. Ex. 14 at 98:14-99:15.  Accordingly, and in light of the Second Circuit's decision in Kirch, the Court concludes that all of the Faiveley plaintiffs satisfy the "business relationship" element of their tortious interference claim.

With regard to the "interference" element of their claim for tortious interference, plaintiffs contend that Wabtec intentionally interfered with their business relationships with North American transit authorities by mislabeling the Products as Wabtec's own during the course of the SAB-Wabco license agreement.[8]  Plaintiffs allege that this mislabeling caused confusion among its prospective customers as to who initially developed the Products.  See Pl. 56.1 ¶¶ 142-3, 126-28.  Moreover, the Faiveley plaintiffs allege that they have lost at least one contract -- for the sale of PB spare kits to NJT -- due to a lingering misunderstanding as to the origin of the Products.  Pl. 56.1 ¶ 143; Def. 56.1 at 62.

---

[8] The Faiveley plaintiffs also allege that Wabtec tortiously interfered with their business relationships by: (1) failing to inform NYCT that it reverse engineered the technology on which it based its successful 2007 bid for a contract with the City; (2) refusing to assist plaintiffs in resolving a technical issue with a Wabtec product; and (3) making disparaging statements about the Faiveley Group to potential customers.  None of the above is sufficient to satisfy plaintiffs' evidentiary burden on summary judgment.  The first item fails because the record evidence is clear that NYCT was fully aware that a Faiveley entity originally designed the products when it awarded the contract to Wabtec.  See Winters Decl. Ex. 187.  The second and third items fail because plaintiffs point to no business relationship that they lost as a result of Wabtec's alleged actions in those respects.  See Plaintiffs' Memorandum of Law in Support of its Motion for Partial Summary Judgment at 20-22.

Though it is clear that Wabtec mislabeled the Products as its own during the course of the license agreement, see, e.g., Mancini Decl. Ex. 14 at 296:14-297:4, Wabtec disputes whether the Faiveley plaintiffs actually lost any business due to this mislabeling. Winters Decl. Ex. 5 at 178:20-181:24.   Indeed, the Faiveley group reacted to the mislabeling by initiating a sustained "marketing campaign" before the termination of the SAB-Wabco License Agreement to educate customers about its rights to the Products.   Amended Complaint ¶ 101; Winters Decl. at 211:10-15.   There is little indication in the summary judgment record as to whether this marketing campaign was successful in eliminating the alleged confusion, and even less indication as to what weight, if any, prospective customers placed on which company originally designed the Products in making their contracting decisions.   See Pl. 56.1 ¶ 143; Def. Opp. 56.1 at 62-63.   On the basis of the foregoing, the Court concludes that genuine issues of material fact remain as to whether the Faiveley plaintiffs suffered any injury that is directly traceable to Wabtec's mislabeling of the Products as its own.[9]

Finally, the Court takes note of plaintiffs' final claim, for unjust enrichment.   To establish this claim, plaintiffs must show (1) that Wabtec benefited, (2) that it did so at the plaintiffs' expense,

---

[9] The Court also notes that the "wrongful means" element is clearly present here, given that the alleged interference occurred by means of separate torts, here trade secret misappropriation and unfair competition.   See All R's Consulting, Inc. v. Pilgrims Pride Corp., 2008 WL 852013, at *16 (S.D.N.Y March 28, 2008).

and (3) that "equity and good conscience" require restitution.  See
Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000).  It is clear that
Wabtec benefited, at plaintiffs' expense, from, at minimum, Wabtec's
tainted reverse engineering process for the Products.  Moreover, as
this claim is for the Court, not the jury, see, e.g., Brown v.
Sandimo Materials, 250 F.3d 120, 126 (2d Cir. 2001) (equitable remedy
of restitution, available "only where there has been a showing of
unjust enrichment" is for the Court, not a jury), the Court
concludes, on the basis of the summary judgment record, that the
undisputed facts establish that equity and good conscious require at
least some restitution.  The Court will defer, however, determining
the amount of such restitution until the jury first determines what
damages it will award on the other claims.

        For the foregoing reasons, the Court hereby reaffirms its
Order dated April 13, 2011 granting plaintiffs' motion for summary
judgment establishing defendant's liability on plaintiffs' claims of
misappropriation, unfair competition, and unjust enrichment, but
otherwise denying the motion, and denying Wabtec's motion in its
entirety.  The parties are reminded that the remaining claim for
tortious interference, as well as the issue of damages on all claims,
will proceed to trial on July 15, 2011 at 9:00 A.M.

        SO ORDERED.

Dated:    New York, NY
          May 12, 2011                    _____
                                          JED S. RAKOFF, U.S.D.J.